30  581
46  459
30  581
s50  765

GEORGE OBERNE ET AL. V. WILLIAM BURKE ET AL.

[FILED OCTOBER 21, 1890.]

1. **Agency.** A principal is bound equally by the authority which he actually gives, and by that which, by his own act, he appears to give. (*Webster v. Wray*, 17 Neb., 579.)

2. **The apparent authority** of an agent which will bind a principal is such authority as an agent appears to have by reason of the actual authority which he has or which he exercises with the knowledge and ratification of the principal.

3. **An authority** to an agent to buy and ship specified commodities and to make cash advances on the same to be delivered, *held*, not to be authority, nor to give semblance of authority, to guarantee in the name of the principal an obligation of K., as purchaser, to pay B. & Co., vendors, for cattle sold on thirty days' time.

ERROR to the district court for Douglas county. Tried below before HOPEWELL, J.

*Montgomery & Jeffrey*, for plaintiffs in error, cited: Story, Agency, secs. 58, 69, 70, 71; *Webster v. Wray*, 17 Neb., 580; *Bohart v. Oberne*, 13 Pac. Rep. [Kan.], 389;

*Hakes v. Myrick,* 69 Ia., 189; *Voorhees v. R. Co.,* 71 Id.; 735; *Stevenson v. Hoy,* 43 Pa. St., 191–6; *Anderson v. Buchanan,* 20 Neb., 272.

*Hall, McCulloch & English, contra,* cited : *Bohart v. Oberne,* 13 Pac. Rep. [Kan.], 389; *Rogers v. Hardware Co.,* 24 Neb., 653; *Webster v. Wray,* 17 Id., 579; *White Lake Lum. Co. v. Stone,* 19 Id., 406; *Scales v. Paine,* 13 Id., 522; *Jackson v. Emmens,* 13 Atl. Rep., 210; *Farrar v. Duncan,* 29 La. Ann., 126; *Butler v. Maples,* 9 Wall. [U. S.], 774; *Cruzan v. Smith,* 41 Ind., 288; *Palmer v. Cheney,* 35 Ia., 281.

COBB, CH. J.

This action was brought by the plaintiffs in the court below for the recovery of $791.28, with interest, due from the defendants upon an alleged written guaranty as follows :.

"SOUTH OMAHA, NEB., Apr. 26, 1887.

"*M. Burke & Sons, U. S. Yds., Neb.*—DEAR SIRS : We hereby guarantee the payment by R. Kunath in thirty (30) days the sum of seven hundred ninety-one and $\frac{28}{100}$ dollars for 17 head of cattle.

"OBERNE, HOSICK & CO.,

"Pr. HARMAN."

The answer of the defendants was a general denial· There was a trial to a jury, with verdict for the plaintiffs for $863.87 damages.

The defendants' motion for a new trial was overruled, and judgment entered on the verdict.

The plaintiffs in error bring the cause for review on the following errors :

"1. The court erred in admitting in evidence the ' Exhibit A' in bill of exceptions, the guaranty sued upon.

"2. In admitting the testimony of F. W. Gasman, objected to.

"3. In admitting in evidence the 'Exhibit B' in bill of exceptions.

"4. In admitting the testimony of George Burke, objected to.

"5. In admitting the testimony of Robert Kunath, objected to.

"6. In admitting the testimony of Wm. W. Keysor, objected to.

"7. In overruling the defendants' motion for nonsuit.

"8. In sustaining the plaintiffs' objections to questions proposed by defendants and stated in bill of exceptions.

"9. In sustaining the plaintiffs' objections to evidence proffered by defendants and stated in bill of exceptions.

"10. In sustaining objections to defendants' questions, stated on pages 71 and 72 of bill of exceptions.

"11. In giving instruction to the jury No. 4, of the court's own motion.

"12. In refusing to give No. 1 asked by defendants.

"13. In refusing to give No. 2 asked by defendants.

"14. In refusing to give No. 3 asked by defendants.

"15. The verdict is not sustained by sufficient evidence.

"16. In overruling the motion for new trial."

It appears by the bill of exceptions that for a period of ten years prior to the date of the written guaranty sued upon the plaintiffs in error were dealers in hides, wool, tallow, grease, furs, and pelts in Chicago, their place of residence, with various branches in other localities in the charge of agents and clerks for the sole purpose of purchasing and shipping to Chicago those commodities. Their Omaha branch was conducted by F. S. Bush, assisted by J. S. Harman as traveling purchaser. It was testified to, at the trial, that in some instances Bush had loaned sums of money to butchers to aid them in purchasing cattle to be slaughtered, the hides and tallow to be taken by Bush on account of the business he was in charge of. That on other occasions verbal assent by telephone at the office in

Omaha, from Bush, had been given to defendants in error for the security of sums on short credit for the purchase of cattle by third persons, and that in three or four instances Bush had paid the amount when the purchaser had failed to do so. It was also in evidence that on September 29, 1886, he had given a written order, in the name of his principal, for the delivery to one Hickstein of twenty-one head of cattle, which had been weighed, to one McCorney and not taken. The cattle were delivered on the order and paid for by Bush, while the principal was unknown to the transaction. Subsequently, in April, 1887, Bush being absent during the month, Harman gave the written guaranty upon which this suit was brought. There is no evidence tending to show that the plaintiffs in error had knowledge of or acquiesced in any of the transactions mentioned, or that they indirectly authorized either agent, in any manner, to assume the debts or assure the credit, or to give a guaranty for third parties in their name, or on account of their business.

H. M. Hosick, of the firm of Oberne, Hosick & Co., testified that the authority of their agents was confined to the buying and shipping of articles in their line of trade, and that they never had authorized J. S. Harman to guarantee any note or notes to M. Burke & Sons, or to any other persons, at Omaha or elsewhere.

F. S. Bush testified that he was, and had been, the business manager of the firm at Omaha for ten years; that J. S. Harman is employed as traveling agent for the firm, and resides in Omaha when not out on the road; that he and all other agents for the firm traveling out from Omaha were under the supervision and direction of the witness, and took their orders from him; that he was absent from Omaha in April, 1887, and left Harman in charge of the firm's business there. The witness was asked: Q. What directions and instructions were given Harman when you left Omaha to go away at that time; which was objected to,

as incompetent, immaterial, and irrelevant, and the objection was sustained by the court, and exceptions taken to this ruling.

Q. Had you written instructions from the firm at this time limiting your authority?

A. No.

Q. Was it any part of the business of the firm at Omaha to go security for anybody who was doing business with them? Objection was made as incompetent, and as asking for a legal conclusion of the witness, and objection sustained by the court, to which exception was taken.

Q. You did at times assist persons in the purchase of cattle when they bought of Burke & Sons, and others?

A. Yes.

Q. In certain instances, when they telephoned, you agreed they should draw on you for the amount of the purchase of cattle?

A. Yes.

Q. And also in one or two instances you agreed to pay if the purchaser did not pay at a certain time?

A. Yes.

Q. State whether or not the firm had knowledge of your having done these things. (Objected to, as irrelevant, and objection sustained.)

The plaintiffs in error offered to prove by the witness, in his reply to this question, that he had verbally, in the name of the firm, guaranteed the indebtedness of other parties; that he did so upon his own responsibility, and without the knowledge or authority of the firm, and that he was not authorized by them to go security for any one in the course of the business he was conducting for them, and offered to prove these facts by the last question, and by those which are to follow. Objected to, as incompetent, and for the reason that the witness had shown that he was the general managing agent for all the business of the firm in Omaha, and that he carried it on at times by advancing

money and guaranteeing payments. The objection was
sustained.

Q. What authority, if any, did you ever receive from
the firm to guarantee the payment of third persons' indebt-
edness?

Q. Did the business of the firm, where you represented
it as agent, include the guaranteeing of sales, or the sign-
ing of such guarantees as that in this action, or going
security for third persons in any way whatever?

Q. Did the firm know that you had at any time, or in
any instance, agreed, in their name, to become security for
a third person, either by a guaranty such as in this action
or otherwise?

Q. What knowledge, if any, did the firm have of your
ever having agreed to become security for the purchases of
a third person, or of your having agreed to guarantee the
payment of the purchases or indebtedness of any third
person?

Q. What greater authority, if any, did you have from
the firm than that for the purchase of the articles of their
trade?

Q. How far did your authority extend, and what were
you employed to do for the firm here in Omaha? State
fully.

Objections were made and sustained to all the foregoing
questions, and exceptions taken to the ruling of the court.

Q. When did you first learn that this alleged guaranty
had been made? Objected to by the plaintiff, on the trial,
and objection overruled by the court.

A. About ten days after I got home, the 17th of May.

On the trial in the court below, after overruling the tes-
timony offered under the foregoing questions, the court
charged the jury, among other instructions, that "it further
appears that the man Harman was in the employ of the
defendants as traveling purchasing agent, with authority
similar to that of Bush; that during a thirty days' absence

of Bush from the branch house at South Omaha, he left Harman in charge of the same, which was known to defendants. It was during the time that Harman was thus in charge that the guaranty sued on was executed and delivered to the plaintiffs; there being no dispute as to the facts recited [the facts recited throughout the instructions], the liability of the defendants is a question of law for the court to decide, and the court instructs you that the defendants are liable, and that your verdict must be for the plaintiffs."

It is not believed from the testimony before the jury, preserved in the bill of exceptions, that the important "facts recited by the court" were not so strongly disputed as to render the court's construction of the law and instruction to the jury inapplicable and partial. The testimony offered, in the form shown by the defendants, and repeatedly overruled on the trial, as to the character of the authority of the agent, does not seem to have been incompetent, immaterial, or irrelevant, but was competent as tending to show the exact and important limitations of the agent's general and implied authority; and we hold that it might have properly gone to the jury and that it was error to overrule it.

The important question involved in this case is, Was the execution of the guaranty sued on an act within the scope of the business in which Harman was employed by the defendants? As to what that business was, the only evidence before the court is that offered by defendants to the effect that it consisted in the purchase of hides and tallow and the commodities stated. It is true there was evidence on the part of the plaintiffs tending to prove that Bush, the general agent of defendants, had at various times in their name guaranteed the obligations of certain butchers to the vendors of cattle, but there is no evidence, even on the part of plaintiffs, that the acts of Bush were authorized or ratified by the defendants, nor that they were

comprehended within the scope of his employment. What the scope of his employment strictly was would be gathered, primarily, from the letter of his employment or appointment as agent, and, secondarily, from the nature of the business in which he was employed, and again from such acts of his within the general scope of his employment as were known to and ratified by his employers, the defendants. But no act of his, extending the scope of his employment, however extensive or often repeated, which did not come to the knowledge of defendants, would enlarge his authority to bind them.

In the cases decided by this court, as well as those cited by the plaintiffs' counsel in the brief, we have gone as far as the farthest in holding that a principal is bound by the acts of his agent within the apparent scope of his authority as agent; and that a party dealing with such agent is not bound by secret instructions or limitations upon the authority of the agent, unknown to such party, so long as the act of the agent to which it is sought to hold the principal is within the general scope of such authority, real or apparent. But we have not gone the length of holding that a principal is bound by the unauthorized acts of his agent, not within the scope of his employment, real or apparent, because of former similar acts of the agent, except where such former acts have been brought to the knowledge of the principal and ratified by him, enlarging the apparent scope of authority covering the acts in controversy.

In the case of *Webster v. Wray*, 17 Neb., 579, Webster purchased a herd of cattle, placing them on his ranch, the whole in charge of Thomas D. Webster, his son, giving him one-fifth interest in the profits of the herd; the agent to have the care and management of the herd, and the principal to pay the expenses of the whole. The agent contracted debts, which the principal, in full knowledge of the facts, paid off. Subsequently the principal, being dis-

Oberne v. Burke.

satisfied with his agent's conduct of the business, took a bill of sale of the agent's interest in the herd, but allowed him to remain in the apparent charge of it, while the principal, as is claimed, forbade the agent contracting any further debts in his name, but gave no notice to the public, to Wray, or other creditors, so far as appears, of any change in the relationship between himself and the former agent. Under these conditions the agent borrowed money, and contracted other obligations in the name of his principal, apparently, and in fact, so far as shown, for the benefit of the range and herd of cattle under his charge, and upon such facts the court held that the principal was bound thereby, in the following language: "A principal is bound equally by the authority which he actually gives, and by that which, by his own act, he appears to give. In our view, the plaintiff in error is bound both by the authority which he gave his son, and that which, by his own acts, he appeared to give."

In the case of the *White Lake Lumber Co. v. Stone*, 19 Neb., 402, the plaintiff owned and carried on a lumber yard at Crab Orchard, in this state. J. H. Hanna was the agent in the exclusive charge and control of the property and business, with authority to sell lumber for cash, or on credit, to receive and receipt for money, and to maintain suits, to make affidavits to accounts for collection, and secure mechanic's liens, or not, as he saw fit, and upon payments to satisfy and discharge liens so secured, and do all necessary to carry out these general duties. One Janousky had erected a dwelling house on his own land, for which he had purchased lumber from the plaintiff, and on account of which the plaintiff was entitled to a lien on the house. The defendant, being about to purchase the house and land, applied to the agent Hanna to ascertain if the plaintiff claimed a lien on the property, and was informed by the agent that the plaintiff had no lien or claim upon the premises, nor any against Janousky which should

become a lien thereon. The defendant bought the land and house. The action was by the Lumber Company against Janousky and Stone, seeking to establish its lien. The court held that the company was bound by the declaration of Hanna as being within the apparent scope of his authority, although it was in evidence that he had no express authority from the company to waive its right to a lien.

The case of *Butler v. Maples*, 9 Wall., 766, arose from a cotton purchase, during the late rebellion, by one Shepherd as agent for Bridge & Co., of Memphis, Tennessee, of which firm Butler was a partner, the cotton having been bought of the defendant Maples in the state of Arkansas. The facts, so far as necessary to illustrate the issues at bar, were that Bridge & Co. had furnished to Shepherd $4,000, stipulating to furnish the necessary amount from time to time to purchase the required cotton. His instructions, in writing, were to the effect that Shepherd's agency was for the purchase of R. C. Stone's and such other cotton as he might be able to purchase in Desha county, Arkansas, and in that vicinity, under the conditions and restrictions set forth. It was further agreed that the agent should buy the cotton if it could be bought at the price stated, and as much more as he could, on the best terms, not to exceed an average of *thirty cents* per pound for middling cotton, and lower in proportion to the grade, to be delivered at such times and places of shipment as might be agreed upon; that Shepherd should pay as little as possible on the cotton until it should be delivered within the protection of a gunboat, and when thus delivered and paid for, the ownership should be exclusively in Bridge & Co., except as the instructions provided for Shepherd's share of the profits. The cotton, for the price of which suit was brought, was purchased by Shepherd, as it lay, he agreeing to pay for it *forty cents a pound* as soon as it could be weighed, and being weighed he removed fifty-four bales of it, but ninety

bales were burned before they could be shipped up the
river to Memphis.   The fifty-four bales were shipped and
received by Bridge & Co., who denied Shepherd's agency.
Maples, the vendor of the cotton, brought suit and ob-
tained service on Butler and Hicox.   It was proved on the
trial by one Martin, a witness for defendants, that he was
sent by them to Arkansas with money and instructions for
Shepherd to purchase cotton for the firm, but was not to
agree to pay more than thirty to thirty-five cents per
pound for it, with authority to make small advances, but
not to pay the balance, or to make it payable, until the
firm should be able to send a boat up the Arkansas river
for the cotton, or until it was in their possession, weighed,
and placed on the boat.   He was instructed to take no
risks, for the firm, of the destruction of the cotton by
incendiaries, or otherwise, except to the extent of the
money advanced.   On a judgment for the plaintiff in the
circuit court of the western district of Tenneesee the cause
was taken to the supreme court of the United States on
error, the principal error assigned being that of certain in-
structions to the jury, in reviewing which the supreme
court says: "That the reasons urged by the plaintiffs in
error in support of their denial of liability for the engage-
ments made by Shepherd are, that he agreed to pay forty
cents per pound for the plaintiff's cotton; that he bought
it where it lay, instead of requiring delivery on board a
steamboat, or within the protection of a gunboat; and
that he did not obtain a permit from the government to make
the purchase.   The argument is, that in the first two in-
stances he transcended his powers, and that his authority
to buy at all was conditioned upon his obtaining a permit
from the government.   All this, however, was immate-
rial, if it was within the scope of his authority that he
acted.   The mode of buying, the price agreed to be paid,
and the antecedent qualifications required of him, were
matters between him and his principals.   They are not

matters in regard to which one dealing with him was bound to inquire."

In each of these cases, as well as in the others cited by counsel for defendants in error, the principle decided is that while the agent continues to act within the general scope of his authority, although he may violate the private instructions of his employer, and go beyond the restrictions contemplated by his employment, if such private instructions and limitations are unknown to the persons with whom he deals, his principal will be bound; but none of them go to the extent of holding that the principal is bound by the act, contract, or obligation of the agent, though made in the name of the principal, in a transaction independent of and not within the general scope of his authority or apparent authority.

By the words "apparent authority" is meant the authority which the agent appears to have from that which he actually does have, and not from that which he may pretend to have, or from his actions on occasions which were unknown to and unratified by his principals.

To return to the present case, the authority of the agents Bush and Harman to bind the defendants in the purchase of commodities for which they were authorized to deal, did not include within its most general scope the authority to execute the guaranty sued on; and no proper or legitimate exercise of the powers or authority which they really had were such as would give it the appearance of embracing or comprehending the authority to make such contract.

As there must be a new trial, I deem it not out of place to say that the evidence, from the bill of exceptions, so far as it relates to the chattel mortgage executed by R. Kunath to the defendants below on the shop and fixtures, and its settlement, and the several transactions connected therewith, was clearly inadmissible under the pleadings, and would have necessarily misled the jury had they been permitted to consider the evidence in rendering their verdict.

The judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.