PYTHIAN LIFE ASSOCIATION V. MARY A. PRESTON.

FILED MARCH 4, 1896. No. 6225.

Life Insurance: MEMBERSHIP FEES: AUTHORITY OF AGENT TO EXTEND CREDIT: SUBAGENTS: DELIVERY OF POLICY. A life insurance association approved an application and issued and forwarded to its general agent a policy for delivery to the applicant. The application and policy each contained a condition providing, in substance, that there should be no binding contract of insurance until the written application was received and accepted and the policy issued by the association and delivered to the pro-posed member in person during his lifetime and good health, nor until the admission fee and advance premium was paid thereon; that no agent of the association had authority to make, alter, or discharge contracts, waive forfeitures, extend credit, or grant permits, and no alter-ation of the terms of this contract shall be valid, and no forfeiture thereunder shall be waived, unless alteration or waiver shall be in writing and signed by the president and another officer of the association. By a contract appointing this general agent of the association, which was signed by the president and secretary thereof, his compensation for soliciting and obtaining parties to be-

come members of the association and insured therein was fixed at the whole sum of the admission fees and advanced premiums to be paid by each person insured. *Held,* That the part of the contract in relation to the compensation of the general agent gave him the right to collect of each person of whom he received an application, when he delivered the policy, the membership, or admission fees and advance premiums and keep them; that in collecting he might, at his option, demand immediate payment or extend credit, and that if he extended credit it was not for the company but for himself; that the association had surrendered the right to any further control or direction of the collection of the fees and advance premiums to be paid by persons insured through this general agent; that the contract with the general agent was inconsistent with their right to insist on the enforcement of the stipulations in regard to payment contained in the application and policy; that a delivery of the policy to the applicant, made, or caused to be made, by such general agent, was good and the contract of insurance binding, notwithstanding credit was extended for the payment of the membership fees and advance premiums.

ERROR from the district court of Douglas county.   Tried below before OGDEN, J.

The opinion contains a statement of the case.

*Jacob Fawcett,* for plaintiff in error:

The agent had no power to waive the condition of prepayment of the premium. (*Brown v. Massachusetts Mutual Life Ins. Co.,* 59 N. H., 307; *Porter v. United States Life Ins. Co.,* 35 N. E. Rep. [Mass.], 678; *Buffum v. Fayette Mutual Fire Ins. Co.,* 85 Mass., 360; *Dircks v. German Ins. Co.,* 34 Mo. App., 31; *Greenwood v. New York Life Ins. Co.,* 27 Mo. App., 401; *Marvin v. Universal Life Ins. Co.,* 85 N. Y., 281; *Todd v. Piedmont & Arlington Life Ins. Co.,* 34 La. Ann., 67; *New York Life Ins. Co. v. Fletcher,* 117 U. S., 536; *Franklin Life Ins. Co. v. Sefton,* 53

Ind., 387; *Morgan v. Bloomington Mutual Life Benefit Ass'n*, 32 Ill. App., 79; *Jeffries v. Life Ins. Co.*, 22 Wall. [U. S.], 47; *Ætna Life Ins. Co. v. France*, 91 U. S., 510; *Johnson v. Maine & New Brunswick Ins. Co.*, 83 Me., 183; *McGeachie v. North American Life Assurance Co.*, 14 Can. L. T., 326; *Levell v. Royal Arcanum*, 30 N. Y. Supp., 205.)

The policy and application constitute the contract. (*Adema v. Lafayette Fire Ins. Co.*, 36 La. Ann., 662; *Chrisman v. State Ins. Co.*, 18 Pac. Rep. [Ore.], 466; *Byers v. Farmers Ins. Co.*, 35 O. St., 606; *Fitzrandolph v. Mutual Relief Society*, 17 Can. S. C., 333.)

The provisions of the contract could only be waived in the manner provided by the policy. (*Birmingham Fire Ins. Co. v. Kroegher*, 83 Pa. St., 64; *Kyte v. Commercial Union Assurance Co.*, 10 N. E. Rep. [Mass.], 518; *Smith v. Niagara Fire Ins. Co.*, 15 Atl. Rep. [Vt.], 353; *Hankins v. Rockford Ins. Co.*, 35 N. W. Rep. [Wis.], 34; *Enos v. Sun Ins. Co.*, 8 Pac. Rep. [Cal.], 379; *Kirkman v. Farmers Ins. Co.*, 57 N. W. Rep. [Ia.], 952; *Burlington Ins. Co. v. Campbell*, 42 Neb., 208.)

*W. C. Van Gilder*, also for plaintiff in error.

*H. C. Brome* and *I. R. Andrews*, *contra:*

We submit that with reference to the provision of the policy upon which the only defense interposed here is based it appears that the insured acted in the utmost good faith. The policy was delivered to him. He paid the admission fee and first premium, and he understood, and the insurance company knew that he understood and had been led by it to believe, that his policy was in full force and effect. Under these circumstances,

in view of the facts of the case, the provision
of the policy imposing a limitation upon the au-
thority of agents has no application. (*Phœnix Ins.
Co. v. Rad Bila Hora Lodge*, 41 Neb., 21; *Haight v.
Continental Ins. Co.*, 92 N. Y., 51; *Whited v. Ger-
mania Fire Ins. Co.*, 76 N. Y., 415; *Shafer v. Phœnix
Ins. Co.*, 53 Wis., 361; *American Central Ins. Co. v.
McCrea*, 8 Lea [Tenn.], 513; *Story v. Hope Ins. Co.*,
37 La. Ann., 254; *Elliott v. Ashland Mutual Fire
Ins. Co.*, 117 Pa. St., 548; *Maryland Fire Ins. Co. v.
Gusdorf*, 43 Md., 506.)

HARRISON, J.

The defendant in error instituted this action in
the district court of Douglas county against the
Pythian Life Association to recover the sum of
$2,000 alleged to be due her from the life associa-
tion under and by virtue of a membership certifi-
cate therein, or a policy of insurance, claimed to
have been issued of date May 31, 1890, upon the
life of Willet C. Preston, who was the husband of
the defendant in error, and who had died since
that date and prior to the commencement of this
suit.    The plaintiff in error, it appears, was a cor-
poration, organized and existing under the laws
of this state, engaged in the business of life insur-
ance, with its general offices or headquarters in
the city of Omaha; that on or about the 31st day
of May, 1890, one David H. Caldwell, who was
then its general agent, received the application
of Willet C. Preston, in the city of Minneapolis,
Minnesota, for membership in the association, or
a policy of insurance upon his life, to be issued by
it.    This application was not procured by the
general agent personally, but was solicited and
procured by one Josiah Towne, who, Caldwell

testifies, was a special agent appointed by him, and who, it further appears, was acting and working under him and his directions and occupying the same office with him. The application was forwarded to the association at Omaha in the regular course of business and was approved, and a certificate or policy, the one upon which this suit was predicated, was issued and sent to Caldwell at Minneapolis for delivery to the insured party. The articles of agreement, under and by which David H. Caldwell was appointed agent of the association and so acted, were signed by its president and secretary, and by the appointee, and as portions of these articles may play a more or less important part in the final disposition of at least some of the vital questions to be herein decided, we deem it best to notice them here. They were as follows:

"This agreement, made this 4th day of January, 1890, between the Pythian Life Association, of Omaha, Nebraska, party of the first part, and David H. Caldwell, of Geneva, Nebraska, party of the second part,

"Witnesseth, That the party of the first part hereby appoints the said party of the second part its general agent for the purpose of procuring and effecting applications for membership in said association that will be satisfactory to said party of the first part, and of collecting membership fees on application thus effected, and for the further purpose of appointing and supervising district, special, and local agents.  *  *  *  The appointing of all subagents shall be at the sole expense of the party of the second part. The party of the first part to be in no way chargeable or responsible to the agents thus appointed for

any salary, commission, or expenses incurred by them or any of them in procuring applications or prosecuting the business of any agency created hereby or hereunder, except as hereinafter stipulated. The party of the second part to be responsible to the party of the first part for the good behavior of his subagents and for their fidelity to the interests of the party of the first part.  *  *  * The compensation allowed said party of the second part for his services rendered under the terms of this contract shall be 100 per cent of the membership fee or advance premium adopted by the party of the first part and collected by the party of the second part, or his subagents, if applications are written for insurance on the mortuary rate or quarterly premium-paying plans; but if written on the natural premium or endowment rate plan, with payments due semi-annually, then an additional compensation of 50 cents per $1,000 of insurance shall be allowed to said party of the second part, to become due and payable when the first semi-annual premium is paid to and received by the said party of the first part; but if application and policy is written on the natural premium or endowment-rate plans and premiums are paid annually, then the sum of $1 per each $1,000 shall be allowed in addition to the membership fee, to be due and payable when the first annual premium is paid to and received by the party of the first part.  *  *  *  The territory assigned to said party of the second part shall consist of the state of Minnesota, and such other territory as may be hereafter agreed upon."

In regard to the connection of Josiah Towne, who personally solicited and received Mr. Preston's application, with the business of the associa-

tion at Minneapolis, where it was taken, and the relation existing between Towne and Caldwell, its general agent, the latter testified as follows:

Q. Are you acquainted with Josiah Towne?

A. I am.

Q. What relation did he occupy to you while you were general agent?

A. As special agent.

Josiah Towne himself testified on this point as follows:

Q. What was your business during the months of June and July, 1890?

A. Soliciting insurance for the Pythian Life Association.

Q. With whom were you associated?

A. D. H. Caldwell.

The president of the life association says:

Q. I will ask you whether or not the defendant company had, to your knowledge, during the months of May, June, and July, 1890, an agent in Minneapolis or Minnesota, by the name of Josiah Towne?

A. No, sir; we did not.

The application for insurance contained the following statements: "It is further agreed that under no circumstances shall the certificate hereby applied for be in force until the actual payment to and acceptance of the advance dues by the association, and actual delivery of the certificate to the applicant during his lifetime and good health, with a receipt for the payment of the advance dues. It is further agreed that this application, its warranties and agreements, together with all the conditions and stipulations contained in the certificate now applied for, shall be binding on me and on any further

legal holder of the policy now applied for. I hereby agree to pay to said association, the money required to keep the certificate issued hereon in full force and effect as provided by the by-laws of said association, and I hereby adopt said by-laws and agree to be governed by them and will obey and comply with every article, its subdivisions, and its stipulations or provisions contained therein;" and on the same subject there was in the policy: "This contract is not binding until the written application therefor shall have been received, accepted, and this policy of insurance issued by the association and delivered to such member in person during his lifetime and good health, nor until the admission fee and advance premium is paid thereon. No agent of the association has authority to make, alter, or discharge contracts, waive forfeitures, extend credit, or grant permission, and no alteration of the terms of this contract shall be valid, and no forfeiture thereunder shall be waived, unless alteration or waiver shall be in writing and signed by the president and one other officer of the Pythian Life Association."

It is contended by counsel for plaintiff in error:

"First—Towne was not in any manner connected with plaintiff in error. He was not its agent or solicitor. He had never been authorized by it to do any business for it. He had absolutely no authority to make any oral agreement for credit, or any other kind of an agreement, either orally or in writing, for plaintiff in error.

"Second—Even if he had been a regular or general soliciting agent of plaintiff in error, he could not bind plaintiff in error by a delivery of the policy in question without full payment of the premium."

David H. Caldwell testified in regard to the delivery of the policy to the insured, as follows:

Q. What did you do with the policy after you received it?

A. In company with Mr. Towne, delivered it to Mr. Preston at the schoolhouse within a day or two from the time we received it.

Q. Did you receive any money at that time?

A. No, sir.

\*          \*          \*          \*          \*          \*          \*

Q. What did you say about this policy having been delivered at the schoolhouse?

A. It was delivered within two or three days of the time received by me at the schoolhouse where Mr. Preston then worked.

Q. By whom?

A. By myself.   Mr. Towne had the policy in his possession and handed it to Mr. Preston while I was with him.

Q. Left it with him?

A. No, sir.

Q. What was done with it?

A. I took it out of his hands.

Q. You took it from Mr. Preston?

A. Later.

Q. How much later?

A. Perhaps fifteen minutes.

Q. Mr. Towne had it in his possession and handed it to Mr. Preston, and then you took it back again from Mr. Preston?

A. After a time.

Q. Did you keep it in your possession after that?

A. I can't say how long; I gave it to Mr. Towne, either the same day, or very soon, to be delivered by him.   The policy has not been in

my possession later than that day further than to
be in that desk.

Q. Then what?

A. I think it was the same day that I gave it to
Mr. Towne.

Q. The same day or about the same time after
you had taken it back from Preston you gave it to
Mr. Towne, did you ever see it again after that?

A. As it lay in our desk, the desk in Towne's
and my office, in that vicinity.

Q. You did not have any more to do with it?

A. I did not.

Josiah Towne stated in his evidence that the
policy was received at the office occupied by Cald-
well and himself and within the next day or two
they went to the schoolhouse in the city, where
the applicant for insurance was employed as jan-
itor, and there talked with him, and what the
conversation was we will give as we find it re-
corded in the transcript of the testimony:

A. Went to the schoolhouse. Mr. Preston was
not there; went out on the side, Twenty-third
avenue I think it is; went in on the street side
and went out on the avenue side. Just as we got
on the sidewalk, Mr. Preston put in an appear-
ance from his residence and met us about twenty
feet from the schoolhouse. I passed the time of
day and shook hands with him and says, "Tony"
—always called him Tony—and took it out and
delivered it to him. He says, "I can't pay for
that to-day. I have just heard from the farm. I
have lost a horse." He spoke something in re-
gard to a note of $80 or $90 that he had got to
meet; taking into consideration the fact of the
note and the loss of the horse he could not take it
then. He had it in his hand and during the con-

versation Mr. Caldwell took the policy from him.
"Well," I says, "Tony, when could you take it?"
This was some time during the middle of the
week; the first or middle of the week. He says,
"I will meet you at the lodge on Friday night."
He says, "I will meet you at my lodge on Friday
night, and I will pay you." I says, "All right, I
will be there." Mr. Caldwell had the policy and
we left with the understanding of the arrange-
ment of Friday evening at his lodge. That was
the conversation then and there.

Q. When did you next see Mr. Preston?

A. On Friday night by arrangement.

Q. What talk, if any, did you have with him
then?

A. I went in to the lodge room and he was pay-
ing his dues and I thought it would be hardly
courteous, I did not think it would, and without
dunning him I went and stood right by him. He
said, "Joe, I can't pay you to-night. I used more
money than I expected. I am paying my dues
to-night, but I will pay you at the office to-mor-
row morning at 10 o'clock," which would have
been Saturday, the 7th. This was the 6th day of
June. I said, "All right, Tony; I will be there at
10 o'clock."

Q. Where did you next see Mr. Preston?

A. At 9 o'clock the next morning at the office,
or on the sidewalk first. He was waiting for me
and was ahead of time.

\*        \*        \*        \*        \*        \*        \*

Q. State what took place there.

A. Went into the office and I sat down and
took the policy out of my pocket. He immedi-
ately commenced to talk that he did not, could
not afford to take that policy and pay for it now.

He recited the fact of the loss of the horse and the note that was coming due and the expense he would be upon the farm; and I said to him,—you want all the conversation between him and myself,—I said to him, "Tony, you are getting to be too old a man to refuse to take any insurance. It is not a matter of accommodation; it's a privilege that any man would insure a man of your age. You are getting old. You have been accepted, the policy is here, you are getting at that time of life you need it; your expectancy is not a great many years." "Well," he says, "Joe, I would rather not take it, I can't pay for it; but," he says, "I will pay you for all your trouble." I says, "Tony, I want nothing if you don't take the policy. I get no commission, but I will not take anything from you if you don't take the policy." I says, "You want to take it even if you don't pay for it all now." I says, "You are perfectly good. I had just as lief take your word as take a bond and," I says, "you want to take it out. You need it," and I passed it over to him. He took it in his hand, unfolded it, not way open, but just merely the face of it in that shape. "Well," he says, "I will take it; and I will pay you $5, and when I come down from the farm, which will be next month, I will pay you the balance." I says, "Tony, that is all right." He paid me $5 and I made a memorandum of it in a book, opposite his name: "Received of Tony Preston, on June 7th, $5." He then handed the policy back to me. He says, "You just keep the policy for me, will you?" I says, "All right." He wanted me to keep the policy. It would be just as safe with me as it would with him. I took and put it in an envelope

and put it in my pocket.   He got up and left the
office.

The policy remained in the possession of Towne
until July 29, 1890, on which date it was given by
him to the son of the insured, who at that time
paid the balance of the amount due of the pre-
mium.   The whole sum of the membership fee
and advance premium we will now state was tes-
tified to be $21.66.   The policy was taken home
by the son and handed to his father, who then
gave it to his wife, the defendant in error.   The
insured had been ill for some days prior to this,
and about two or three hours after turning the
policy over to his wife, died.   It appears that the
following assessments, or calls, were sent from
the main office of the association, addressed to
Mr. Preston:

OMAHA, NEB., July 31, 1890.

"*Bro. Willet C. Preston, Minneapolis, Minn.:* You
are hereby notified that we have charged to your
insurance account the amounts this day falling
due in accordance with the terms of your policy
Nos. 2348, 2349, and that your account now stands
as follows:   *   *   *   The amount shown above
to be now due to balance, $11.62, must be received
at the home office on or before August 29, 1890,
in order to prevent forfeiture of your insurance.
*   *   *   Make remittances payable to the
Pythian Life Association.   Pay to D. H. Cald-
well, R. 16, K. P. Block, Minneapolis, Minn."

"OMAHA, NEB., July 1, 1890.

"BROTHER: Satisfactory proof of death has
been submitted to the association for the follow-
ing claim:   *   *   *   in consequence whereof
the managing board of directors, as provided in
article 9, section 2, of the by-laws of the associa-

tion, as set forth in your policy of insurance, have ordered that a mortuary call be made upon all the members of the mortuary payment plan, of a two-thirds quarterly, mortuary premium and a 33 1-3 per cent dividend or deduction be made from the maximum quarterly premium of members insured on the national premium plan. This call is made upon all members insured prior to this date.

"Fraternally yours in F., C. & B.

"GEORGE ESMOND,

"*Acting Secretary Pythian Life Association.*"

It further appears that the defendant in error wrote to the association and requested that blank proofs of loss be sent to her; that this was done; that she procured them to be filled out and forwarded to the association; that they were received, and after they were examined a request was sent to Mrs. Preston to furnish some additional matters in the same connection, which she did.

The practical workings and benefits of insurance, both on life and property, are now universally acknowledged and adopted in countries where civilization and intelligence prevail, and people generally avail themselves of it under some of the different plans of issuance, either what is denominated the plan of the old line companies, or the mutual plan, or the lodge or association plan, etc. Whatever the plan, there is usually, if not always, issued some contract or agreement, most often styled a "policy" or "certificate of membership," as the case may be. In some jurisdictions the forms and conditions of these are provided and prescribed by law, but in the majority are left to be agreed upon by the

insurer and insured.   The insurer usually mak-
ing them as numerous and as stringent as seems
best calculated, or, as experience has taught, will
best subserve the end desired to be attained in
the conduct of the business.   If the public, the
customers, could be induced to pay more atten-
tion to the matter and examine the conditions
and stipulations of the policies issued to them,
and, where they are arbitrary or unreasonable be-
yond justice between the parties to the contract,
demand that they be made less complicated and
made consonant with a spirit of equity, or be re-
fused or not received, no doubt the framers would
soon discover a way by which they could be made
safe and fair and also bear and pass the scrutiny
of the public, the customers.   But where it is, as
it has heretofore been, the task of the legislator
to pass laws to effect the purpose above sketched,
or the judiciary or courts of the land to annul an
unreasonable and unfair stipulation and condi-
tion when a case involving the validity is pre-
sented for adjudication, it was, and is, naught
but a mere trial of the skill and ingenuity of the
draughtsmen of the policies to frame new condi-
tions to evade the laws enacted by the legislat-
ures, or to fill the place of such as are declared
void or robbed of their effect by the courts.   Con-
tracts of insurance occupy no different position
in the eyes of the law than do any other agree-
ments, and when not unconscionable and unfair,
should be enforced as made between the parties.
The stipulation in the contract sued upon in the
case at bar, that it should not be binding unless
the membership fee and what was styled "the
advance premium" were paid and the policy actu-
ally delivered to the person whose life was to be

insured thereby during life and good health, and the condition that no agent had authority to extend credit, were neither of them unjust or unfair or incapable of enforcement, nor such as should not be enforced in exact conformity with the letter and spirit. The association, it appears, had appointed a general agent, and the agreement which gave his appointment effect, assigned or in effect made his, as his compensation for what business he might do for it, all membership fees and advance premiums, and apparently without any further regard for how he received them or when, or what arrangements he might make as to their payment, whether he exacted it as contemplated by the terms of the policy or extended credit, as it is claimed he did in this particular instance. Our belief that the arrangement with the general agent should be thus construed is much strengthened by the facts that Preston had been considered by the association as one of its members, and it had recognized him in that relationship, by notifying him to contribute dues and premiums and mailed him a notice of a mortuary call. Clearly it would be violative of the principles of justice and right to hold that an arrangement might exist between the association and its agent by which the membership fees and advance premiums to be paid by an applicant for insurance became the property of the agent, and the association was no further interested in them, or their payment, had no further control over them, and whether payment was exacted on delivery of the policy, credit was extended, or payment was entirely waived, could in no manner affect the association or its rights or funds, and say that if the agent extended credit or made the applicant a

present of the membership fees and advance premiums, and the party to whom a policy had been delivered under such circumstances, died, that the policy was not in force. While it is very evident that, under the terms of the application and policy, no credit could be extended for the association, or rather it was the intention that none should be, it is equally clear that by their agreement it had no further power or control over the membership fees or advance premiums, and could make no objections to credit being extended by the general agent. The contract which the association entered into with him, by which he became entitled to the whole amount of such fees and premiums, was inconsistent with the stipulations contained in the application and policy, in regard to the payment of the fees and advance premiums, or their enforcement as against a party to whom their general agent had granted time for their payment. The policy was prepared and forwarded to the general agent by the association to be delivered and he to receive payment of fees and premiums of which no part belonged to the association, but to the general agent. If delivered, it was in full force, without regard to any arrangement made between the agent and the party insured respecting the time of payment of the advance premium. (*Smith v. Provident Savings Life Assurance Society of New York,* 65 Fed. Rep., 765, and cases cited.) The facts of the case referred to were somewhat different from the facts in the case at bar, but the principle of law applicable and decisive the same, and equally applicable and controlling in the present case.

In regard to the contention that Towne was not an agent of the association, in no manner

connected with it or its business and could not bind it by delivering a policy to the applicant, or by any agreement to extend credit, the general agent testified that Towne was a special agent for the association, appointed by him (the general agent) by virtue of the authority conferred upon him by his contract with the association, by which it will be remembered he was empowered to appoint special agents, but however this may have been, there was ample evidence to show that Towne was soliciting business for the association, working with and under the orders and directions of the general agent, and whether he was recognized by the association as an agent, or in its service, or its officers had any knowledge of his work, or his existence, is immaterial. The policy in question was forwarded to the general agent for the delivery. He turned it over to Towne, who had solicited and received the application, and directed him to deliver it to the party for whom by its terms, it was intended, and Towne followed the directions, and as appears from the testimony, gave it to Willet C. Preston, who left it with Towne for safe-keeping, and if the arrangement in respect to extension of credit for the payment of a portion of the amount due as fees and advance premiums, effected at the time of such delivery, was satisfactory to Caldwell, the general agent to whom the moneys to be paid belonged, and it is a fair inference that it was, no one could complain and certainly not the association, for, as we have seen, it had no interest in the fees or premiums to be paid at that time, or how they were paid, or when. We must conclude from a full investigation of the testimony that it sustains a finding of the delivery of

the policy sued upon in this action and in such a manner and at such a time as constitute it a valid, subsisting, and binding contract between the party applicant, and thereby insured, and the association. What occurred between Towne and Preston at the time the policy was given by Towne to Preston, considered with all the other facts and circumstances shown by the evidence and which were necessarily incident to and had a direct bearing upon this part of the transaction, constituted in legal effect a delivery of the policy.

There is an assignment of error which reads as follows: "The court erred in giving the second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, and sixteenth instructions given by the court on its own motion, to which the plaintiff excepted." Instruction numbered 11, given by the court on its own motion, was without fault, also some of the others enumerated in this assignment. The assignment was as to all the instructions, and having determined that it is not well taken in respect to one or more, in accordance with a well established rule of this court, it must be overruled as to all.

It is further assigned as error: "The court erred in refusing to give the first and second instructions asked by the plaintiff in error, to which refusal plaintiff in error duly excepted." No. 2 of the instructions referred to in this assignment, in some of the statements contained therein, would have incorrectly informed the jury, and the refusal to give was therefore proper. The error assigned was of the refusal to give the two instructions, and it being determined that the action of the court as to either of them was without error, it disposes of the entire assignment.

This disposes of all the errors which were urged in the argument,. and it follows from the views herein expressed and the conclusions reached that the judgment of the district court must be

AFFIRMED.