GERMAN AMERICAN STATE BANK, APPELLANT, V. MUTUAL BENEFIT, HEALTH & ACCIDENT ASSOCIATION ET AL., APPELLEES.

FILED NOVEMBER 17, 1921. No. 21644.

1. **Principal and Agent: NOTES: GUARANTY.** The mere fact that an insurance company knows that its soliciting agents, in selling its

German Am. State Bank v. Mutual Benefit, Health & Accident Ass'n.

insurance, take notes payable to themselves for the premiums, and on their own responsibility discount the notes, deduct their commissions and remit the balance of the proceeds of the notes to the company, is not sufficient to impute to the company the further knowledge that promises are being, or may be, made by such agents that the insurance company will guarantee payment of the notes.

2. ——: ——: ——. Such soliciting agents, authorized to sell insurance and procure the issuance of policies to applicants only upon remittance to the company of the net premium in cash, have no implied authority, from the mere fact that they are permitted to extend their individual credit to applicants, to bind the insurance company by a contract to guarantee the notes so taken by the agents from such applicants.

3. ——: ——: ——: ACTIONABLE FRAUD. False representations by such soliciting agents, in making an arrangement with the bank for the discount of all such notes so taken, that the insurance company was back of such transaction and would guarantee payment of the notes and would deposit money in the bank as security, were more than mere promissory representations, but were representations as to the present attitude of the company toward such transaction, and, being false, are actionable.

4. ——: ——: UNAUTHORIZED ACTS OF AGENT: RATIFICATION. The acceptance of the proceeds of the notes previous to any knowledge on the part of the company, either actual or imputed, of its agents' unauthorized acts, which purport to bind the company, does not constitute ratification, since, in order that the principal be estopped, he must have had such knowledge of its agents' unauthorized acts as to give him an opportunity to exercise a choice between an adoption of the transaction and an assumption of its burdens, or a rejection of it in its entirety.

5. ——: ——: ——: ——. In order that a ratification will result from a continued retention of the fruits of such a transaction, which have been received by the principal in ignorance of the unauthorized acts of its agents, the principal must, after attaining knowledge, be able to return what he has received and be restored to his original position.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Affirmed in part, and reversed in part.*

*Nolan & Woodland* and *Byron G. Burbank,* for appellant.

126     NEBRASKA REPORTS.     [Vol. 107

German Am. State Bank v. Mutual Benefit, Health & Accident Ass'n.

*Kennedy, Holland, De Lacy & McLaughlin* and *Lambert, Shotwell & Shotwell, contra.*

Heard before MORRISSEY, C.J., ROSE, ALDRICH and FLANSBURG, JJ., BROWN and ELDRED, District Judges.

FLANSBURG, J.

This is an action for damages brought by the German American State Bank against the Mutual Benefit, Health & Accident Association, Clair C. Criss, president of such association, and Floyd C. Grovey, a soliciting agent. The action is based upon the claim that certain worthless notes, taken by Grovey, and other soliciting agents, as first premium notes on policies issued by the defendant insurance company, had been sold to the plaintiff bank through false and fraudulent representations, made by the said agents; that the said Grovey and other soliciting agents, in so doing, acted within their actual and ostensible authority as agents of said insurance company; and further that the company had received the benefits from the transaction and had thereby ratified its agents' acts. The trial court, upon the evidence adduced in behalf of the plaintiff, directed a verdict in favor of all defendants and dismissed the case. The plaintiff appeals.

The contention of the plaintiff is twofold, one being that the soliciting agents, in selling notes to the bank, made promises and representations at the instance of the defendant insurance company, within the actual or ostensible authority of such agents, and with the full knowledge and approval of such insurance company; and the other that, in any event, the company having received a portion of the proceeds of the sale of said notes, and not having returned the same, after its discovery of the fraudulent acts of its agents, had thereby ratified their transactions.

The plaintiff bank is located in the town of Chalco, Nebraska. It had a capital stock of $10,000, and deposits, at the time in question, of between $45,000 and $48,000. The defendant company is a mutual benefit, health and

accident association, with its office in Omaha. In July, 1916, the defendant Grovey, with four other soliciting agents of the defendant insurance company, went to the town of Chalco for the purpose of selling health and accident insurance. They presented themselves at the plaintiff bank and stated that Chalco, and the territory around, was an excellent field for selling their insurance, but that it was necessary that they take notes from applicants for the first premium. Plaintiff's testimony shows that they represented they would sell insurance to, and take notes from, only farmers, business and professional men of responsibility in that county and immediate vicinity, and represented that, if plaintiff would arrange to discount the notes, the defendant insurance company would guarantee their payment. Though they stated that the company was not allowed to take notes for first premiums, nor to indorse them, still they represented that the company was back of their transaction, and, as to the notes to be sold to the bank, said: "The paper is guaranteed by the (defendant) company," that the company is in on this, "they get the proceeds of the money." When the president of plaintiff bank objected that the bank was small and could not afford to advance any considerable amount of money in the purchase of such notes, the defendant's agents represented that the defendant company would deposit as much as $5,000, to be covered by time certificates, the deposit to be held by the bank as security for the payment of the notes, and that, if any of the notes were not paid when due, the company would take them up. The bank thereupon agreed to discount notes for these agents. With regard to this arrangement, the plaintiff bank had no dealings or correspondence with any of the general officers of the defendant insurance company, nor with defendant Criss, its president, but dealt only with the soliciting agents mentioned.

The first few notes taken by the bank were discounted at approximately 16 2/3 per cent. of the face of the notes, and from then on, by agreement, the discount was 10 per

cent. Since the average time for maturity of the notes was six months, and since they bore interest at 10 per cent. per annum, the profit to be made by the bank was to have been an exceedingly large one. During the six months following, the plaintiff bank discounted notes, presented by these soliciting agents, to the amount of $41,371. For the first few months of this period most of these notes were made payable to and indorsed by one Jenkins, one of such soliciting agents, and it appears that on October 10 the plaintiff bank, through its directors, requested and procured from the five soliciting agents, who were acting in conjunction in the matter, a written agreement, signed by each of such solicitors, providing that, if the bank should be unable to collect any of the notes when due, such soliciting agents would take up the notes and pay to the bank their amount, less the original discount, plus interest. This agreement purported to be a guaranty on behalf of the soliciting agents personally, and not a guaranty on behalf of the defendant insurance company, made by these parties as agents for the company. Since the plaintiff did not at this time seek any written guaranty from the company but from the agents only, its action would seem to indicate, and defendant insurance company lays considerable stress upon that argument, that the plaintiff had not been relying upon any guaranty made by the agents on behalf of the company, and, in fact, did not consider that any such guaranty existed.

Not until on December 11 following, at a meeting of the directors of plaintiff bank, was a committee appointed to call upon defendant insurance company, to procure from the company a contract that it would guarantee the payment of the notes. When the committee called upon this defendant, it was promptly informed that defendant insurance company would not, and could not, under its by-laws, guarantee such notes; that it did not take first premium notes from applicants for insurance, but required that the payment of first premiums

should be in cash, and that, where soliciting agents took notes for the first premiums, it was purely a matter of extension of credit to the applicant by the agent, and that the agent, in all cases, was required to account to the company in cash. Subsequent to this meeting the defendant insurance company, on December 19, wrote a letter to the plaintiff bank reiterating these same statements.

Up to that time the plaintiff bank had discounted for the soliciting agents notes to the amount of $22,918. Upon receiving this information from the insurance company, that any transaction that the plaintiff had with the soliciting agents was purely a matter between the bank and the soliciting agents, the bank did not cease but still continued to discount paper, and from that time forward discounted notes to an aggregate face value of $18,453. It was not until in March, 1917, after an investigation of the bank by the state bank examiner, and objection by him to-the bank's discounting any more of such paper, that the bank ceased purchasing notes and finally concluded its dealings with the defendant's soliciting agents. At this time one of these agents insisted that the bank continue to take notes, alleging that the agents had always performed their agreement in taking up unpaid notes when due. To this demand the bank president made answer that it was necessary to refuse to purchase notes because of the attitude of the state bank examiner.

Defendant Criss, president of the insurance company, stated that neither the company nor any of its general agents had any knowledge of any guaranty arrangement between these soliciting agents and the bank until December 11, though the record shows, and he testifies, he knew that these soliciting agents would take and were taking, as is the custom in the sale of such insurance, notes from applicants for insurance to cover the payment of the first premium; that as a usual thing, in such business, agents took notes in perhaps 90 per cent. of the cases. The agents were entitled, under their contract with the defendant insurance company, to one-half of the first

premium as their commission. When the agent forwarded an application to the insurance company, with an amount in cash to cover one-half of the first premium, the company accepted such money and issued the policy, knowing that the agent might take, and quite probably had taken, a note for the first premium, payable to himself, and disposed of the note to his satisfaction, so as to be able to both realize a commission and forward to the company the necessary cash.

It further appears that in July, shortly after the soliciting agents first made their arrangement with the plaintiff bank, the defendant insurance company deposited $1,000 with such bank and took as evidence thereof a certificate of deposit to run one year. Similar deposits, however, it was shown, were made by this insurance company in many small banks throughout the community where it wrote insurance, and it does not appear at the time this deposit was made that the defendant company was informed or charged with notice, in any way, that the bank intended to treat such deposit as a security for payment of the notes in question under an arrangement made by the soliciting agents.

It is further pointed out by plaintiff that, during the period of the sale of these notes, the bank, at the time of discounting the notes, would, in many instances, issue to the soliciting agents certificates of deposit in lieu of cash, and many of these certificates were transferred to the defendant insurance company in payment of net premiums due to the company on the policies issued. These certificates of deposit coming into the hands of the insurance company in this way totaled at one time some $6,000, but there is nothing in the testimony to show that the insurance company, nor that any of the agents of the company, unless it was the soliciting agents mentioned, considered the deposits in the bank, represented by these certificates, as having been placed there to secure the payment of the notes in question, nor that the insurance company, its president or general agents had any

knowledge of any arrangement whereby it was to make deposits with the plaintiff bank for such purpose. The fact that the defendant company held so much on time certificates is not at all inconsistent with its position that it knew nothing of its agents' representations, to the effect that the company would make deposits to secure the payment of notes, since, it quite clearly appears, the insurance company would have received such time certificates and held them to maturity, regardless of any such agreement as that represented to have been made by its agents.

After December 11, the date when the insurance company had denied any connection with the transaction between its solicitors and the plaintiff bank, it made certain arrangements with attorneys, representing the plaintiff bank and who were attempting to collect the notes, that it would cancel policies, where the notes had not been paid, and credit unearned premiums on the notes, in order to minimize the loss, but this was under an express agreement that what it should do in that regard should not be to its prejudice in any way in denying its liability upon the transaction in question.

It appears also that in two or three instances, where the premium note taken by its soliciting agent had not been paid and the policy issued was delivered up, the defendent company canceled the policy and issued another policy, in lieu thereof, and delivered it to its agent, retaining the net premium theretofore paid on the canceled policy, and that the agent substituted the premium note of the new applicant in place of the unpaid note held by the bank. The company, in these instances, did not, as we view it, treat the notes as its own and forfeit the policies for nonpayment, but simply allowed the agent, where the premium notes had not been paid, and where the policy had been voluntarily redelivered by the policyholder to the agent, to turn in the policy and receive another policy, issued to another applicant, but upon the credit by the insurance company of the cash premium theretofore remitted by the agent on the original policy. Noth-

ing in that action can be treated as an admission, on the part of the company, that it was a party to the notes in any way, nor did its action amount to an assumption by it of a right to forfeit policies upon nonpayment of the notes given and made payable to its soliciting agents.

It also appears that the company, after it had on December 11 refused to guarantee payment of the notes, remitted considerable amounts, which had become payable on accident claims to the parties insured, direct to the bank, so as to allow a credit of the amounts to be made upon the notes held for premiums. This, however, was nothing more than an arrangement in accommodation to the bank and to the company's agents, and a transaction whereby they were enabled to collect the amount owing from the company to the insured and credit the insured with payment of the amount upon the notes.

It is contended by the plaintiff that the facts, as above shown, are sufficient to support a finding that the transaction between the plaintiff bank and the defendant's soliciting agents was actually known to and participated in by the defendant insurance company. With this contention we are unable to agree. We do not see that these facts, so far as the insurance company is concerned, go any further than to show that the company knew its agents were selling its insurance, taking notes payable to themselves for the premiums, and, on their own responsibility, discounting the notes at the bank. We find nothing, at least prior to December 11, 1916, to show, nor to charge the insurance company with knowledge of, a contract of guaranty, by which the insurance company was itself to become bound as a guarantor upon these notes. After December 11, the date when the company had made a complete disavowal and refusal to make such a guaranty, the bank could not, of course, continue to purchase notes and hold the company as a guarantor upon them.

The question next presented is whether or not the agents had either actual or ostensible authority to bind

the company on such a contract of guaranty. These were only soliciting agents, who had authority to sell insurance and procure the issuance of a policy to the applicant, by remittances to the company of the net premium in cash. They informed the bank that the company did not take nor indorse notes given on first premiums. The notes taken by these agents were not payable to the company, but were payable to the agents personally and indorsed by them to the bank. They had no authority to take notes in payment of premiums. Their transaction was one between themselves, the applicant, and the bank, by which the net premium could be procured in cash and forwarded to the insurance company. When the net premium was forwarded and the policy issued, the first premium, as far as the company was concerned, was paid. The insurance company had no interest in the notes, nor right to forfeit the insurance in case of their nonpayment. *Union Life Ins. Co. v. Parker,* 66 Neb. 395; *Pythian Life Ass'n v. Preston,* 47 Neb. 374; *Reppond v. National Life Ins. Co.,* 100 Tex. 519, 11 L. R. A. n. s. 981; *Jacobs v. Omaha Life Ass'n,* 146 Mo. 523; *Buckley v. Citizens Ins. Co.,* 188 N. Y. 399.

Counsel for plaintiff cite cases to the effect that, when the company thus allows its agents to extend credit to the applicant and take notes payable to such agents, the action of the agents in negotiating, or even in taking, the notes will, as between the company and the insured, be held to constitute payment of the premium, and that the moneys collected on such notes will be considered to be funds held in trust for the insurance company. *Echols v. Mutual Life Ins. Co.,* 106 Neb. 409; *Travelers Ins. Co. v. Douglas Co.,* 198 Mich. 457; *Security Life Ins. Co. v. Stephenson,* 136 S. W. (Tex. Civ. App.) 1137; *Thum v. Wolstenholme,* 21 Utah, 446.

These holdings are upon the theory, however, that the company has allowed its agent to substitute his personal obligation in place of that of the insured and, such having been done, the obligation of the insured is settled.

The account would then stand between the insurance company and its agent. But it does not follow, in thus allowing the agent to extend his individual credit to the insured, and in allowing the agent to negotiate the note in order to raise the necessary money to forward to the company, that the company itself has extended the credit, nor that the company has any concern in protecting the agent in the personal obligation assumed by him.

In the light of the surrounding circumstances, known to all the parties, the alleged transaction in this case between the bank and the soliciting agents was, from all outward intents and purposes, one for an agreement whereby the agents were contracting that their principal would guarantee their individual obligations.

These agents had no express authority from the company to guarantee payment of notes so taken. It does not appear that, to conduct the insurance business, it was necessary that the company guarantee such notes taken by its agents, nor that by usage or custom such was within the scope of the agents' implied powers. That being the case, authority to guarantee will not be implied from the mere fact of general agency of any kind. The plaintiff bank had the right to presume that the soliciting agents of the defendant company were authorized to sell insurance in the usual manner and make such contracts as would reasonably comport with usage and custom in that business, and to that extent the agents may be said to have been acting within the apparent scope of their authority. But where there is no implication, by reason of circumstances, of reasonable necessity, or of custom or usage, it seems clear that the agents here would have had neither authority nor the semblance of authority to make such a contract of guaranty as that in question. *Englehart v. Peoria Plow Co.,* 21 Neb. 41; *Oberne v. Burke,* 30 Neb. 581; *Graul v. Strutzel,* 53 Ia. 712; *First Nat. Bank v. Farson,* 226 N. Y. 218; *Owens Bottle-Machine Co. v. Kanawha Banking & Trust Co.,* 259 Fed. 838; 2 C. J. p. 665, sec. 313, p. 636, sec. 280.

It is contended that the defendant insurance company has ratified its agents' transactions by an acceptance and retention of the benefits.    The acceptance of the proceeds of the notes, previous to any knowledge on the part of the company, either actual or imputed, of its agents' unauthorized acts which purported to bind the company, would, of course, not constitute ratification, since in order that the principal be estopped he must have had such knowledge of his agents' unauthorized acts as would give him an opportunity to exercise a choice between an adoption or a rejection of the full consequences of such acts.    *Bullard & Co. v. De Groff,* 59 Neb. 783; *Fitzgerald v. Kimball Bros. Co.,* 76 Neb. 236; *Holm v. Bennett,* 43 Neb. 808; *O'Shea v. Rice,* 49 Neb. 893; 2 C. J. 495, sec. 115.    When with knowledge he accepts the benefits, he is estopped from denying an assumption of the burdens. Prior to December 11, 1916, we have found there was no such knowledge; and following that date the company at that time having made a complete disavowal, there could have been no contract nor deceit by the company's agents regarding such a contract.

But counsel contend that the company has not tendered a return of the proceeds of the notes after a discovery of the facts, and that its continued retention of the benefits works a ratification.    In order that a ratification will result from a continued retention of the fruits of such a transaction which have been received by the principal in ignorance of the unauthorized acts of its agents, the principal must be able to return what he has received and be restored to his original position.    Had the insurance company, after discovering the facts, been able to make restitution without undergoing loss, the case would have been different; but here it had issued its policies of insurance, had furnished insurance thereunder, and, had it attempted to exercise its statutory right to cancel all insurance yet unexpired, it would have been required to return the unearned premiums to the policyholders.    It had valid and subsisting contracts with the persons whom

136          NEBRASKA REPORTS.          [Vol. 107

German Am. State Bank v. Mutual Benefit, Health & Accident Ass'n.

it had insured, and, so far as the insurance company was concerned, the premiums were paid. As pointed out, the company had no right to cancel the policies by reason of default in payment of the notes. The company then was not able to make restitution of the funds received without a consequent loss in the amount of funds returned, since it had become legally obligated to furnish the value of those funds to others. Under such circumstances, we cannot see that the company can be held to a ratification of its agents' acts by reason of its failure, after attaining knowledge, to return the moneys received by it. *Marshall & Co. v. Kirschbraun & Sons*, 100 Neb. 876; *Owens Bottle-Machine Co. v. Kanawha Banking & Trust Co., supra;* 2 C. J. 496, sec. 116.

The question of the liability of the defendant Grovey, one of the soliciting agents, remains yet to be determined. The petition was framed upon the charge of fraud. One of the false representations, as we have said, was to the effect that these agents would sell insurance to and take notes from only farmers, business and professional men of responsibility. It is admitted that each note bore on its face the name of the maker, his residence and occupation, and that many of the signers did not come within the represented class. Of course, this information written on the note would not indicate the responsibility of the maker. The plaintiff's cashier, however, testified that he did not rely upon this representation, but upon the representation as to the insurance company's guaranty of the notes. There is testimony in behalf of the plaintiff to support the issue that the agents represented that the insurance company was behind their transaction; that it would guarantee the notes; that it would furnish a deposit as security; and that these representations were relied upon. In view of this testimony, it is reasonable that the bank should also believe that the deposit, which was actually sent by the insurance company, was sent under and in recognition of this arrangement. Other evidence in behalf of plaintiff, on the other hand, tends

to refute this testimony. The fact that the bank on October 10 took a guaranty from the agents personally, the fact that the bank sent a committee to the insurance company on December 11 in order to get a guaranty from the company, and made no suggestion whatsoever about representations made by the insurance company's agents, to the effect that the company would guarantee the notes, and the fact that the company continued to discount notes after December 11, might lead to the inference that the bank had not been relying upon any such guaranty, but would not, as a matter of law, refute the direct testimony in behalf of the plaintiff, that the bank did rely upon the representation that the insurance company was behind the transaction and would guarantee payment of the notes. As to whether or not there was such a reliance during the period from the first discount of the notes up to the time when the company made its disavowal on December 11, it would seem to us, the record presents an issue of fact for the jury.

The argument is made that these representations were nothing more than promises on the part of the agents as to what the insurance company would do in the future, and, though such representations might create contractual obligations on the agents' part, they would not be actionable on the ground of fraud. The representation that the insurance company was back of the agents in the transaction and would guarantee the notes and deposit security was more than a mere promise to procure such a guaranty. It was, as well, a representation of the then existing intention and attitude of the insurance company. It is quite obvious such was the idea intended to be conveyed. That representation was a false representation as to existing facts. The company's attitude is clearly shown to have been contrary to what was represented. Plaintiff, in all reason, would not have relied on the insurance company warranting the notes, except for the representations as to the company's existing at-

titude. The bank, being bound to take knowledge of the limitation of authority of these agents, could not have relied on a warranty or a promise of warranty made on behalf of the company by them, based alone upon that authority. The misrepresentation of the company's attitude, as we view it, was fraudulent and actionable. *Cerny v. Paxton & Gallagher Co.,* 78 Neb. 134; *Pollard v. McKenney,* 69 Neb. 742; *McCready v. Phillips,* 56 Neb. 446; *Gale v. McCullough,* 118 Md. 287; *Deyo v. Hudson,* 225 N. Y. 602; *Nickle v. Reeder,* 166 Pac. (Okla.) 895; *O'Sullivan v. France,* 168 N. Y. Supp. 28; *Old Colony Trust Co. v. Dubuque Light & Traction Co.,* 89 Fed. 794.

There is proof to show that many of the notes were worthless and that the bank sustained injury. As to notes taken by the bank subsequent to December 11, when the falsity of the representations relied upon became fully known, it does not appear, as the record now stands, that plaintiff has any cause of action on the ground of fraud.

The judgment of the lower court, dismissing the case against the insurance company, is affirmed, and the judgment as to the defendant Grovey is reversed and the cause remanded for further proceedings.

AFFIRMED IN PART, AND REVERSED IN PART.